COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, *ss.*
SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY
DOCKET No. BD-2024-020

IN RE: RONALD BRUCE KAPLAN

MEMORANDUM OF DECISION

This matter came before me on an information and record of
proceedings filed by the Board of Bar Overseers (board) in
February 2024 under S.J.C. Rule 4:01, § 8 (4), as appearing in
453 Mass. 1310 (2009).  The respondent, Ronald Bruce Kaplan, was
charged with misconduct related to divorce proceedings between
the respondent and his former wife.  The respondent was alleged
to have asserted frivolous defenses to requests for discovery,
made false statements to judges of the Probate and Family Court,
obstructed opposing counsel's access to documents, and
repeatedly violated court orders to pay alimony and attorneys'
fees.

A hearing was held on March 13, 2024, attended by assistant
bar counsel and the respondent with his counsel.  The Office of
Bar counsel (bar counsel) and the board recommend that the
respondent be suspended from the practice of law for eighteen
months; the respondent disputed the Hearing Committee's

(committee) conclusions of law, as well as the length of the
sanction recommended by the board.  On consideration thereof and
for the reasons set forth below, it is ordered that the
respondent's license to practice law is suspended for a period
of eighteen months.

1.  Background.  The following facts were found by the
committee.  At the hearing before this court, the respondent
confirmed that he does not contest the committee's factual
findings at this stage.

The respondent was admitted to the Massachusetts Bar on
January 23, 2002, and practiced as Kaplan Law Offices in
Holbrook.  Relevant to this matter, his practice included
collections, drafting wills and revocable and irrevocable
trusts, and divorce.

The respondent and his former wife, Lucretia A. Kaplan,
were married for twenty-six years and raised two sons.  Lucretia
was the family's primary wage earner, and she funded the
respondent's college and law school educations as an adult.
Since 2000, Lucretia has been unable to work due to a work-
related injury and has been collecting disability benefits.  On
November 10, 2008, the respondent filed for divorce, and a
judgment of divorce entered on November 3, 2009.  The divorce
judgment contained no provision for alimony.

Between 2010 and 2014, the respondent and a friend, Kevin

Kane, a contractor and builder, engaged in approximately ten real estate transactions.  Pursuant to their verbal agreement, the respondent would purchase land through a trust, Kane would renovate the residential property on that land, and the respondent would help with paperwork and bookkeeping.  At the time of a sale, the partners split the proceeds equally.  The respondent and Kane were thus equal partners in a profitable real estate endeavor.

During this period, the respondent made use of a series of interconnected trusts to buy, hold, and sell property.  The respondent deposited his real estate income into the Tralfaz Revocable Trust, for which he was the only trustee.  The sole listed beneficiary of the Tralfaz Trust was another trust, the Aspinwall Trust, controlled by Kane.  In addition to the Tralfaz Trust, the respondent was the sole trustee of three other trusts: the Oak Street Trust, the Surehold Trust, and the Johnson Trust.

As was true for the Aspinwall trust, the Oak Street, Surehold, and Johnson trusts were all nominee trusts.  A nominee trust is "an entity created for the purpose of holding legal title to property with the trustees having only perfunctory duties."  Morrison v. Lennett, 415 Mass. 857, 860 (1993), quoting Johnston v. Holiday Inns, Inc., 595 F.2d 890, 893 (1st Cir. 1979).  Nominee trusts are "typically used for maintaining

anonymity of ownership, easing transferability, and avoiding title transfers." Guilfoil v. Secretary of Executive Office of Health & Human Serv., 486 Mass. 788, 797 (2021), citing Roberts v. Roberts, 419 Mass. 685, 689 (1995).

Aspinwall was listed as the sole beneficiary of the Surehold and Johnson trusts, while Tralfaz was the sole beneficiary of the Oak Street Trust. The Aspinwall trust was controlled only by Kane with no involvement by the respondent, and Kane had no interest or involvement in the four trusts for which the respondent was trustee.[1]

In June 2013, Lucretia retained Attorney John McGlone to help her in seeking alimony and, on November 19, 2013, McGlone filed a complaint for modification in the Probate and Family Court. In March 2014, the respondent engaged Attorney Teresa Lord, an experienced family law attorney. A dispute arose regarding the respondent's responses to Lucretia's requests for discovery.

At the first of two pretrial conferences, McGlone complained that the respondent, prior to Lord's involvement, had

---

[1] The committee rejected the respondent's testimony that the four trusts of which he was trustee actually benefitted Kane. Kane testified that he had "zero" interest in any of those trusts and denied that any had been set up to benefit him or his family, notwithstanding that Kane's Aspinwall trust was listed as the beneficiary of the Tralfaz, Surehold, and Johnson trusts. The committee credited Kane's testimony.

not produced discovery for seven months. The respondent refused
to produce any documents pursuant to a request under Rule 34 of
the Rules of the Probate and Family Court, as amended, 466 Mass.
1401 (2013), on the purported basis that counsel mistakenly had
referred to the respondent as "Robert" rather than "Ronald"
Kaplan in the definition section. The respondent had also taken
the position that the documents sought by Lucretia were not
discoverable because they related to trusts, not the respondent
individually. In response to Lord's claim at the hearing that
the respondent had produced all of his tax returns, McGlone
noted that the respondent had given him a single page of one tax
return, with no Schedule C, E, G, or Z.

As to the relevance of the discovery, McGlone explained
that the respondent's financial statements regularly reflected
negative income from his law practice. However, McGlone
observed that, despite this negative income, the respondent's
debts did not increase from one financial statement to the next.
Indeed, the respondent's assets had increased, and records
McGlone had obtained from the town of Holbrook showed that the
respondent had "flipped" several houses in the past two years.
Lord countered that the respondent had no income reflected in
his annual Social Security statements for 2008 through 2012, had
practiced law minimally because he was disabled, and had lived
off the cash he had received in the divorce settlement.

Approximately eight months later, at the second pretrial conference, McGlone complained that the respondent still was not providing bank statements or trust documents.  Rather, McGlone represented to the court that he had been forced to subpoena Crescent Credit Union (Crescent) for statements, whereupon the respondent threatened to sue the bank if it complied with the subpoena.[2]  Lord admitted she was surprised that the respondent was not turning over documents, and that it was her understanding that he was doing so.  On March 27, 2015, the judge entered an order requiring the respondent to produce "any and all bank records that Ronald B. Kaplan has signature authorization on including" four specific accounts at Crescent, and to produce "copies of any and all Trust instruments . . . for which Ronald B. Kaplan is the Donor, Trustee, and/or beneficiary."  Lord withdrew her appearance shortly after the hearing, and the respondent thereafter represented himself.

Eventually, McGlone obtained some documents for the Oak Street, Surehold, and Johnson Trusts from the Registry of Deeds. At a hearing on the respondent's motion to reconsider the March

---

[2] A representative from the bank also appeared at the pretrial conference and, in unsworn testimony, corroborated that the respondent had threatened to sue the bank if it complied with the subpoena.  McGlone gleaned from the statements ultimately produced by the bank that the respondent had several open accounts at Crescent, despite listing just one account on his financial statement.

27, 2015 order to produce discovery, the respondent claimed that
he was prohibited from producing documents related to the
trusts, stating that he "can't give these things up because
they're not mine to give up and I've been told not" to do so.

   After a two-day trial on Lucretia's complaint for
modification, the judge entered findings and a judgment on
December 31, 2015.  The court found, inter alia, that the
respondent had intentionally tried to conceal his income from
his real estate transactions; failed to list on his financial
statement the funds in the Tralfaz Trust or to produce tax
returns for that trust despite being its sole trustee; failed to
produce documents to support his claim that funds from the
Tralfaz Trust that he had used to pay personal expenses were
loans; had met his own living expenses for years "despite his
claims of negative self-employment income as an attorney";
failed to list on his financial statements, signed under the
pains and penalties of perjury, property he owned at 109R
Woodlawn Avenue in Holbrook; failed to cooperate in discovery;
and gave testimony that was not credible in a number of
respects, including regarding disabilities he claimed to have,
for which he provided no documentation.  The court further made
a general finding that, "[a]fter observing [the respondent] in
court and considering his testimony and lack of supporting
documentation, the Court concludes that [he] was not truthful."

Ultimately, the court concluded, "[b]ased on the available evidence, and drawing reasonable inferences from the overwhelming evidence of hundreds of thousands of dollars which have passed in and out of the Tralfaz Trust since the parties' divorce," that the respondent had the ability to pay alimony in the amount of $450 per week.  The judge ordered the respondent to pay $450 per week retroactive to the date of Lucretia's service of the 2013 complaint for modification, and also ordered, based on a finding of bad faith by the respondent to delay discovery in the case, payment of $31,000 in attorney's fees to Lucretia.

Between 2016 and 2019, Lucretia filed five complaints for contempt against the respondent for failure to pay the court-ordered alimony, back alimony, and attorney's fees.  The respondent defended against the complaints by arguing that he was unable to work due to disability and lacked the financial means to pay.  The judge hearing the first three contempt complaints in 2016 and 2017 repeatedly rejected the respondent's defenses on the basis of the December 31, 2015 judgment and associated findings that the respondent did have the ability to pay.  In response to each of the first three complaints for contempt, the judge ordered the respondent to pay certain amounts of the arrearages by then accrued, on penalty of serving a suspended thirty-day jail sentence (and, in the third contempt

judgment, also ordered payment of additional attorney's fees to
Lucretia).  At a hearing after the respondent had satisfied the
third contempt judgment in 2017, and noting that the respondent
had liquidated a retirement account in order to do so, the court
stated that it would hold an evidentiary hearing regarding
ability to pay on any future contempt complaint.

In the ensuing 2018 judgment and memorandum of decision
following a hearing on Lucretia's fourth motion for contempt,
the judge found that the respondent by that time owed an
additional $8,930 in back alimony; credited Lucretia's
attorney's representation that the respondent had been seen on
at least two occasions representing private clients in the
District Court; cited the respondent's admission that he had
private clients; did not credit the respondent's testimony that
a disability rendered him unable to work; and noted that none of
the income tax returns submitted by the respondent between the
years 2003 and 2017 included a Schedule C for his income as a
practicing attorney.  The judge again found that the respondent
had the ability to pay the $450 per week in ordered alimony and
again entered a suspended jail sentence, to be served unless the
defendant paid at least $10,000 of the alimony arrears and
$10,000 of the attorney's fees arears.  Beginning October 18,
2018, the respondent served some of the thirty-day sentence for
non-compliance with the fourth contempt judgment, until he

satisfied the contempt order on October 26, 2018, and was released from jail.

Lucretia thereafter filed the fifth contempt motion, resulting in the respondent's fifth adverse judgment on March 29, 2019.  The judge there found that the respondent had not made any alimony payments since the prior September 2018 hearing; found a letter from the respondent's physician to be not persuasive as to the respondent's claimed inability to work; did not credit the respondent's claim that he lacked the resources to pay his alimony obligation; and again found that the respondent had the ability to pay alimony of $450 per week. The court sentenced him to sixty days in jail unless he paid $20,000 in alimony arrears and $10,000 in attorney's fees arrears.

In June 2019, the respondent filed a complaint for modification in the Probate and Family Court.  As of the time these disciplinary proceedings were initiated, the court had not heard the respondent's complaint.[3]

---

[3] The court takes judicial notice of related docket entries illuminating the subsequent course of events, though the court places no weight on them for purposes of this decision.  See In re Zita, 455 Mass. 272, 282 (2009).  The respondent had filed an appeal from the December 31, 2015 judgment and order to pay $450 weekly in alimony, and later filed a number of other notices of appeal from subsequent orders in the case.  The appeals did not progress, and, in May 2022, Lucretia moved the Probate and Family Court to dismiss them all.  The judge denied the request,

2.  <u>Disciplinary proceedings</u>.  In October 2021, the
respondent was charged with a single count of violating the
disciplinary rules of Massachusetts.  Bar counsel filed a motion
for issue preclusion based on the underlying probate court
orders, which the board chair denied.

In the complaint, bar counsel alleged that the respondent,
as part of postdivorce probate court litigation with Lucretia,
asserted issues without a basis in fact; made false statements
of fact to the judge while failing to correct earlier false
statements; unlawfully obstructed Lucretia's access to evidence;
concealed material documents from her or otherwise failed to act
reasonably in response to proper discovery requests; and
knowingly disobeyed obligations under the relevant rules.  The
respondent's conduct was alleged to violate Mass. R. Prof. C.

---

writing that the court was "not satisfied that [the respondent]
caused delays[,]" and that, "to the extent that the parties want
this [c]ourt to address modification proceedings that are also
subject to appeal, they shall seek leave from the [A]ppeals
[C]ourt."  In August 2022, a single justice of the Appeals Court
consolidated the respondent's various appeals under docket
number 2022-P-0770 and granted leave to the Probate and Family
Court to hear the respondent's complaint for modification during
the pendency of the appeal.  In December 2022, the Probate and
Family Court entered a judgment approving, and ordering the
parties to comply with, a memorandum of understanding they had
reached, pursuant to which the respondent would make three
payments to Lucretia amounting to a total of $23,000, in
consideration for which Lucretia would not request any further
payments as alimony or otherwise.  As also provided in the
parties' agreement, the respondent thereafter voluntarily
dismissed his consolidated appeals in May 2023.

3.1 (claims or defenses that are frivolous in law or fact); rule 3.3 (a) (1) (false statements of fact or law to tribunal or failure to correct false statement previously made); 3.4 (a) (unlawful obstruction of another party's access to evidence or unlawful concealment of document having potential evidentiary value); 3.4 (c) (failure to obey obligations under rules of tribunal); 8.4 (c) (conduct involving dishonesty, fraud, deceit, or misrepresentation); 8.4 (d) (conduct prejudicial to administration of justice); and 8.4 (h) (other conduct reflecting adversely on fitness to practice law).

The respondent, represented by counsel, filed his answer in November 2021.

a.  <u>Hearing committee</u>.  A hearing was held over seven nonconsecutive days between May 10 and October 25, 2022. Seventy-six exhibits were admitted and nine witnesses testified: respondent himself; his former wife Lucretia; her attorney McGlone; Attorney Jeffery Johnson, who represented a lender who had financed building projects by Kane; respondent's former counsel Lord; respondent's romantic partner Linda Corcoran; respondent's rheumatologist Amy J. Wu, M.D., and psychiatrist and neurologist Stanley M. Cole, M.D.; and his real estate business partner Kane.  On January 6, 2023, the parties filed their proposed findings of fact and conclusions of law.

The committee issued written findings on May 17, 2023.

Regarding the respondent's conduct with respect to discovery issues in the divorce proceedings, the committee found that the respondent had impeded Lucretia's discovery in the underlying case, including by refusing to produce financial documents concerning the Tralfaz Trust.[4]  The committee did not credit the respondent's explanation that he could not produce tax returns for the trusts because Kane would not allow him to do so. Instead, the committee credited Kane's testimony that he was not involved with any of the respondent's trusts, including the Tralfaz Trust.  And the committee found the respondent's testimony that he had "not obstruct[ed] the discovery process[] . . . at all," to be in bad faith, and adopted the Probate and Family Court judge's finding that the respondent "failed to cooperate in the discovery phase of the case" and, in so doing, forced the filing of motions to compel and "caused unnecessary delay."

Regarding the respondent's omissions on his financial statements signed under the pains and penalties of perjury, the committee agreed with the judge that the respondent's financial

---

[4] As an example demonstrating both the potential salience of these documents as well as the respondent's conduct, the committee cites Exhibit No. 42, in which McGlone requested statements from "1/1/09 to 7/30/10" for the Tralfaz Trust account.  The respondent eventually produced statements only for the period "11/30/09 to 7/30/10."  Notably, the November 30, 2009, statement reflects that, during that month alone, the account's balance jumped from zero to $219,450.73.

statements, particularly the settlement statements from July 28, 2015, and September 4, 2015, omitted material facts, including his ownership of real estate and income derived therefrom. Additionally, the committee found that the respondent did not disclose all his bank accounts; claimed falsely that the funds in the Tralfaz Trust were not his, despite using the funds to pay for personal expenses; could not explain how he routinely was able to meet his expenses, despite claiming negative income;[5] and denied falsely to the judge that he was "buying and flipping houses."

Regarding the respondent's failure to abide by court orders, the committee found that, on five occasions, the respondent knowingly refused to comply with court orders that he pay alimony and attorney's fees despite his ability to pay. Following the original alimony order entered in 2015, a judge heard testimony from the respondent across multiple hearings; each time the respondent's arguments were rejected, such as inability to work due to disability or inability to pay, in part

---

[5] The respondent claimed to have borrowed money from both his brother and the Tralfaz Trust to meet his expenses. However, the relevant financial statements do not reflect any such loans, and the committee concluded that, "to the extent there was money 'borrowed,' these were not actual loans as there was no [] expectation that the funds needed to be repaid." The committee found a similar lack of supporting evidence as to the respondent's purported "debt" owed to his romantic partner, Linda Corcoran, who paid approximately $37,000 to clear alimony arrears and purge him of contempt.

because he owned pieces of real estate.  Consequently, the
committee found that the respondent's disobedience of court
orders was knowing.[6]

The committee also issued a set of findings squarely
concerning the respondent's credibility and candor before the
committee itself.  "In many particulars," the committee "did not
find him credible" and found that "he actively tried to mislead"
the committee.  Among other such findings, the committee found
not credible the respondent's testimony before the committee
that he did not make money on his real estate ventures with
Kane; found that the respondent "was not forthright" and in some
particulars gave "patently untrue" testimony about the degree to
which he paid for personal expenses from the Tralfaz accounts;
and did not credit the respondent's testimony "that the 3,5000
square foot house he lives in, at 130 Weymouth Road in Holbrook,
actually belongs to Kane or to Kane and his wife."  Although the
committee "credited that Kane loaned the respondent money and is
owed money by him" with respect to that property, it nonetheless
found "that the respondent put in more money than Kane, and that
the house is the respondent's," and credited Kane's testimony

---

[6] The committee cited to Krokyn v. Krokyn, 378 Mass. 206,
213-214 (1979) ("Common sense and basic concepts of fairness
support the notion that ownership of a valuable asset
demonstrates ability to pay without further inquiry as to
whether payment can be enforced directly against the asset").

that the house was worth about $700,000.  In sum, the committee

found that the respondent "used the various trusts he has set

up, and the Tralfaz bank accounts, to hide or obscure the true

nature of his real estate holding and dealings"; that the

respondent had "hidden behind Kane to deepen and further this

deception"; and that he "created an elaborate shell game of

trusts and related, undisclosed bank accounts with a single goal

in mind: to hide assets and to defeat any claim against them by

his [former] wife."[7]

    Based on the foregoing, the committee determined that bar

counsel proved that the respondent violated rule 3.1 (a),

asserting a defense without a good faith, nonfrivolous basis for

doing so; rule 3.3 (a) (1), making knowingly false statement of

---

[7] In its observations on the respondent's credibility and
candor, the committee further found that the respondent's tax
returns contained "significant irregularities," such as claiming
unsubstantiated deductions for rental payments and excessive
amounts of alimony.  On appeal to the board, the respondent
argued that the committee mistakenly found that he inflated the
alimony reported on his tax returns ($191,750 total for tax
years 2017, 2018, 2019, and 2020).  However, as the board noted,
the total amount of alimony ordered for each of those four years
was only $23,400 per year ($450 per week) for a total of
$93,600.  Even including $30,000 in arrears and the $31,000 in
attorney's fees claimed by the respondent, the amount paid is
still far less than $191,750.  At one point, the respondent
argued that he actually paid $194,800; however, the board noted
that his calculation is based on five years of owed alimony
payments, whereas the committee's findings were based on four
years.  In any case, as the board further noted, the respondent
proffered no evidence on appeal that he actually paid the amount
owed in the relevant years.

fact or law to a tribunal; rule 3.4 (a), obstructing unlawfully
another party's access to evidence or unlawfully concealing a
document having potential evidentiary value; rule 3.4 (c),
knowingly disobeying obligations under the rules of a tribunal;
rule 8.4 (c), engaging in conduct that involves fraud, deceit,
or dishonesty; and rule 8.4 (d), engaging in conduct prejudicial
to the administration of justice.[8]  The committee disagreed,
however, that the respondent should be found in violation of
rule 8.4 (h) (lawyer may not "engage in any other conduct that
adversely reflects on his or her fitness to practice law").  The
committee reasoned that bar counsel had not directed its members
to any "other" additional conduct that would violate rule
8.4 (h), and, consequently, a sanction for that rule would be
duplicative of the sanction for violating rule 8.4 (c).

The committee rejected all of the respondent's proposed
mitigating factors.[9]  In aggravation, the committee found the

---

[8] While the committee agreed that bar counsel had proven "a
technical violation" of rule 3.4 (d) (lawyer shall not, in
pretrial procedure, make frivolous discovery request or fail to
make reasonably diligent effort to comply with proper request by
opposing party), the committee found that the charge was in
essence a lesser included offense for the same conduct that
incurred the rule 3.4 (a) charge (for unlawfully obstructing
access to evidence) and declined to "double-count it" for
sanction purposes.

[9] For example, the committee rejected the respondent's claim
that the contentious nature of the divorce proceedings, and the
fact that he was self-represented, were mitigating.  See Matter

following factors to be material: the respondent's lack of
candor; the multiplicity of violations; his greed and self-
interest; and the harm he caused to his former wife Lucretia and
the administration of justice.  The committee did not agree that
the respondent's failure to comply with probate court orders
should be considered as a factor in aggravation, because that
misconduct formed the very basis of the violation of rule 3.4
(c).  As an appropriate sanction, the committee recommended a
license suspension of eighteen months.

b.  Appeal to the board.  The respondent timely appealed to
the board.  The respondent challenged the committee's finding of
rule violations in a number of respects.  With respect to the
finding that he violated rule 3.1 (a), the respondent maintained
that he did have a nonfrivolous basis in fact when he informed
the probate court that Kane refused to permit him to produce
trust documents, and further contended that the committee
exceeded its authority when the committee itself subpoenaed Kane
as a witness to testify after bar counsel had rested and after

_of Griffin_, 440 Mass. 500, 509 (2003) (lawyer's personal
relationship with case and contentious nature of proceedings not
mitigating factors); _Jordan_ v. _Register of Probate for Hampton
County_, 426 Mass. 1020, 1020 (1998) (pro se litigants in probate
court "held to the same standards as litigants who are
represented by counsel").  Additionally, the committee did not
find the respondent's chronic health problems to be mitigating.
See _Matter of Haese_, 468 Mass. 1002, 1007-1008 (2014) (burden on
attorney to demonstrate causal relationship between medical
issues and charged misconduct).

the respondent, who had listed Kane as one of his witnesses,
indicated he would not call Kane himself.  With respect to rule
3.3, he argued the rule does not apply to lawyers appearing pro
se.  And he argued that the committee's finding that he violated
3.4 (c) could not stand because his inability to pay excused his
noncompliance with the probate court orders.  The respondent
further argued that, even if the committee's findings of
misconduct were upheld, the appropriate length of suspension
would be three or four months.

The board adopted nearly all of the committee's decision
and filed an information with this court also recommending that
the respondent be suspended for eighteen months.  Like the
committee, the board concluded that the respondent violated
Massachusetts Rule of Professional Conduct 3.1 (a) by failing to
produce discovery based on arguments the committee deemed
frivolous regarding Kane's supposed refusal to permit
production; rules 3.3 (a) (1) and 8.4 (c) and (d) by filing
financial statements with false and incomplete information and
testifying falsely to the judge about his finances;[10] rules
3.4 (a) and 8.4 (d) by withholding discovery unlawfully from

---

[10] The committee agreed that the respondent's
misrepresentations concerning his conversation with Kane also
violated rule 3.3 (a) (1).

Lucretia;[11] and rule 3.4 (c) by repeatedly failing to comply with
court orders to pay alimony.  However, the board disagreed with
the committee's interpretation of rule 8.4 (h) and interpreted
the rule as distinctly prohibiting conduct that reflects
"adversely" on the lawyer's fitness to practice law, without
requiring separate or additional behavior.[12]  And the board
determined that the respondent's conduct did violate rule
8.4 (h).

In weighing aggravating and mitigating circumstances, the
board agreed with the committee that the respondent presented no
evidence to support mitigation.  Additionally, the board agreed
that the respondent's lack of candor; his greed and self-
interest; the multiplicity of his violations; and the harm he
caused to Lucretia and the administration of justice were
aggravating factors.  The board likewise concluded that the
respondent's failure to comply with probate court orders should
be considered only in connection with his violation of rule

---

[11] The board declined to disturb the committee's conclusion
that, while this conduct technically violated rule 3.4 (d), that
violation was a "lesser included offense" of the rule 3.4 (a)
charge.

[12] The board cited as examples cases including Matter of
Gannett, 489 Mass. 1007, 1011 (2022) (trust account malfeasance
that violated Mass. R. Prof. C. 1.15 [b] [2] [ii] and 1.15 [c]
also violated rules 8.4 [c] and 8.4 [h]); Matter of Lupo, 447
Mass. 345, 356-357 (2006) (lawyer's conduct in filing
retributive suit against daughter of client "for filing a
grievance against him" violated both rule 8.4 [d] and 8.4 [h]).

3.4 (c), not in aggravation.

The board determined that the respondent's mendacity and multiple rule violations "form[ed] a web of misconduct" that "displayed contempt for the probate court, his [former] wife and the administration of justice." The board therefore agreed with the committee's recommendation of suspension for eighteen months. The board agreed with the committee that the circumstances here are highly similar to those in Matter of Laroche-St. Fleur, 490 Mass. 1020, 1024-1025 (2022) (suspension of eighteen months upheld for attorney filing knowingly false financial statements in her personal divorce proceedings, disobeying probate court judge's orders resulting in contempt judgments, and pursuing frivolous litigation).

c. Information and record of proceedings before this court. The board filed an information and record of proceedings before this court, pursuant to S.J.C. Rule 4:01, § 8 (4), on February 13, 2024. A hearing was held on March 13, 2024.

3. Discussion. a. Standard of review. We uphold "[t]he subsidiary findings of the hearing committee, as adopted by the board, '. . . if [they are] supported by substantial evidence.'" Matter of Weiss, 474 Mass. 1001, 1001 n.1 (2016), quoting S.J.C. Rule 4:01, § 18 (5), as appearing in 453 Mass. 1315 (2009). See Matter of Abbott, 437 Mass. 384, 391 (2002), and cases cited. "[T]he [] committee's ultimate 'findings and recommendations, as

adopted by the board, are entitled to deference, although they
are not binding on this court.'" Weiss, supra, quoting Matter
of Ellis, 457 Mass. 413, 415 (2010). See Matter of Lupo, 447
Mass. 345, 356 (2006); Matter of Hiss, 368 Mass. 447, 461
(1975). The committee is the sole judge of credibility. Matter
of Zankowski, 487 Mass. 140, 144, 37 Mass. Att'y Discipline Rep.
554 (2021). Accordingly, its "credibility determinations will
not be rejected unless it can be said with certainty that the
finding was wholly inconsistent with another implicit finding"
(internal quotations omitted). Matter of Haese, 468 Mass. 1002,
1007 (2014).

b. Rule violations. i. Frivolous claim. Rule 3.1
provides, in relevant part, that "[a] lawyer shall not bring,
continue, or defend a proceeding, or assert or controvert an
issue therein, unless there is a basis in law and fact for doing
so that is not frivolous." The record supports the committee's
conclusion that the respondent violated rule 3.1 when he falsely
told the probate court that Kane's "opposition" precluded
production of relevant trust documents. And there is no merit
to the respondent's related claim that Kane's testimony before
the committee was improper.

The committee found that the respondent's defense to
production of the trust documents was frivolous because it had

no basis in fact.[13]  The committee credited Kane's testimony at

the hearing that he had nothing to do with the four trusts

controlled by respondent, and that the respondent never asked

him for documents concerning Kane's Aspinwell Trust, which the

respondent had named as the beneficiary of some of his trusts.

The committee did not credit the respondent's contrary claim

that Kane objected to disclosure of the various trust-related

documents nor, indeed, credit that a conversation between the

two men had ever taken place regarding the discovery requests.[14]

In light of these credibility findings as well as the other

evidence in the record, the committee's finding that the

respondent's defense to production was baseless and violated

rule 3.1 rests on firm ground.  See Matter of Haese, 468 Mass.

at 1007.  See also S.J.C. Rule 4:01, § 8 (3) (committee panel

act as "sole judge" of credibility of testimony presented at

---

[13] The committee and board did not reach the question
whether the defense would also have been frivolous as a matter
of law, even if it had a basis in fact.

[14] The respondent's own testimony regarding this supposed
conversation evinced the baselessness of refusing to produce the
trust documents due to Kane's supposed objection.  See B.B.O.
No. C3-19-00262446, Tr. Vol. VI at *209 ("I had gone to [Kane]
and asked him, and he said, oh, don't produce the tax returns
[for those trusts]. . . .  [A]nd I don't know why because they
weren't really his tax returns, but he kept telling me don't do
that, so I objected" [emphasis added]).

hearing).[15]

And the board correctly rejected the respondent's challenge on appeal to the committee's use of B.B.O. Rule 4.5 (d) to subpoena Kane to testify after bar counsel had rested and after the respondent had indicated that, notwithstanding Kane's presence on his witness list, he would not call Kane. The respondent claimed the committee acted outside its authority by calling Kane to fill holes in bar counsel's case.

As an initial matter, this court has stated repeatedly that "bar discipline cases are not criminal" proceedings. Matter of Eisenhauer, 426 Mass. 448, 454, cert. denied, 524 U.S. 919 (1998). See Matter of Jones, 425 Mass. 1005, 1007 (1997). Accordingly, the respondent was "not entitled to the full panoply of rights afforded to a criminal defendant," Matter of Eisenhauer, supra, which include the rule that the prosecution must provide sufficient evidence to establish its case-in-chief

---

[15] Contrary to the respondent's argument before this court, the committee's finding that the respondent's "defense" to production violated rule 3.1 did not rest solely on Kane's testimony. The respondent's own inherently implausible explanation for his refusal to produce the trust documents, see note 14, supra, provided additional grounds in the record. See Matter of Zankowski, 487 Mass. at 153 (while attorney "is entitled to defend against allegations of a petition for discipline, the hearing committee may determine whether to credit the testimony and evidence, and it may consider in aggravation any lack of candor it finds"). See, e.g., Matter of Strauss, 479 Mass. 294, 301 (2018) (committee not required to credit respondent's unbelievable defense to depriving client of funds).

prior to resting its case. See Mass. R. Crim. P. 25 (a).
Rather, the fact-finding process in bar discipline hearings is
more flexible, in furtherance of their primary purpose to
protect the public and ensure confidence in the integrity of the
bar. Matter of Gordon, 385 Mass. 48, 55 (1982).

As part of this more flexible fact-finding process, B.B.O.
Rule 4.5 (d) permits the hearing committee to, "on its own
motion, subpoena any witness to appear and give testimony or
produce evidence at any hearing." Neither this rule, nor any
Board of Bar Overseers rule, limits who may be called or when.
Here, the committee, acting in its role as factfinder, acted
within its discretion to subpoena and question Kane. See Matter
of Saab, 406 Mass. 315, 328 (1989). The need for Kane's
testimony became apparent during the proceedings, as it became
clear that the respondent's defense to nonproduction rested on
Kane. In any event, the respondent cannot claim surprise or
prejudice; he had listed Kane as a potential witness, and the
committee subpoenaed Kane only once the respondent indicated he
in fact would not be calling him.

ii. Financial situation and documentation. Rule 3.3
(a) (1) provides that a lawyer "shall not knowingly[] make a
false statement of fact or law to a tribunal or fail to correct
a false statement of material fact or law previously made to the
tribunal by the lawyer." Rules 8.4 (c) and (d) state,

respectively, that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation," or "engage in conduct that is prejudicial to the administration of justice."

The record supports the committee's conclusion that the respondent repeatedly filed sworn financial statements with false information and testified falsely before the tribunal in violation of rule 3.3 (a).[16]  The committee's findings in this regard include that the respondent's financial statements, signed under the pains and penalties of perjury, falsely omitted his profits from his real estate business with Kane and omitted property that he owned outright at 109R Woodlawn Avenue; indeed, the five sworn financial statements in the record submitted by respondent between November 2013 and July 2015 do not disclose that the respondent owned any real estate assets at all.  The record also supports the committee's further finding that, notwithstanding that Kaplan was not formally listed as beneficiary of the Tralfaz Trust, the respondent falsely represented that the profits he deposited in that trust's account were not available for his personal use and falsely characterized his use of the funds as unsubstantiated "loans."

---

[16] The record also supports the committee's further conclusion that the respondent's misrepresentations regarding his conversations with Kane also violated this rule.  See Part (3) (b) (i), supra.

Because the respondent's "deceit[ful]" financial statements
and testimony "prejudice[d] the administration of justice" by
forcing the court to expend its finite resources separating fact
from fiction, the committee also concluded that the respondent
violated Mass. R. Prof. C. 8.4 (c) and (d).  The board agreed,
as does this court.  See Matter of Balliro, 453 Mass. 75, 81
(2009) (attorney's false statements to prosecutor and false
testimony under oath at trial violated Mass. R. Prof. C. 3.3 [a]
[1], 8.4 [c] and 8.4 [d]).

Moreover, the board correctly rejected the respondent's
argument on appeal that rule 3.3 (a) does not apply to lawyers
whose false statements to a tribunal occur outside of
representing a client, such as in representing himself pro se.
The respondent relied on comment [1] to the rule, which states:
"This [r]ule governs the conduct of a lawyer who is representing
a client in the proceedings of a tribunal."  The board reasoned
that the respondent's argument had no basis in the text of rule
3.3 (a) itself, which governs a lawyer's statements to a
tribunal without regard to whether a statement is made in the
context of representing a client.  See Mass. R. Prof. C. 3.3 (a)
("A lawyer shall not knowingly [] make a false statement of fact
or law to a tribunal or fail to correct a false statement of
material fact or law previously made to the tribunal").  The
board also noted that the respondent's interpretation was

plainly at odds with the purpose of the rule as well as our case law.  See id., comment [2] (rule 3.3 "sets forth the special duties of lawyers as officers of the court to avoid conduct that undermines the integrity of the adjudicative process" [emphasis added]); Matter of Laroche-St. Fleur, 490 Mass. at 1025 (self-represented lawyer's filing of knowingly false financial statements in her personal divorce proceedings violated rule 3.3 [a] [1]); Matter of Livingstone, 27 Mass. Att'y Discipline Rep. 548 (2011) (attorney witness suspended for filing notarized affidavit containing knowingly false statements in violation of rule 3.3 [a] [1]).  This court agrees with the board's conclusion that our requirement of candor under rule 3.3 (a) does not permit a lawyer to make false statements to a tribunal simply because the false statements are in furtherance of the lawyer's own personal interests.

iii.  Withheld discovery.  Rule 3.4 (a) provides, in relevant part, that a lawyer shall not "unlawfully obstruct another party's access to evidence or unlawfully alter, destroy, or conceal a document or other material having potential evidentiary value."  Rule 8.4 (d) states that a lawyer who "engage[s] in conduct . . . prejudicial to the administration of justice" commits professional misconduct.  The record supports the committee's conclusion that the course of conduct by the respondent during which he violated rules 3.1, 3.3 (a), and 8.4

(c) and (d) -- repeatedly by refusing to comply with proper

discovery requests despite an eventual court order to comply

therewith, in part on the false basis that he had "been told not

to" by Kane -- amounted to "repeated and strenuous efforts to

keep properly-requested information from his ex-wife, resulting

in numerous motions and substantial Court time and resources"

that violated rules 3.4 (a)[17] and 8.4 (d).  See <u>Matter of Hayes</u>,

493 Mass. 1010, 1011 (2023) (attorney's strategy to conceal

funds from probate court in action by mother of client's child

to increase child support violated rules 3.1, 3.4 [a], and 8.4

[d], among other rules).[18]

---

[17] The record contains additional examples of the respondent obstructing Lucretia's access to evidence without justification. See, e.g., HCR ¶78 (relevant documents produced only upon subpoena of bank by opponent and threat by respondent to sue bank).

[18] As noted <u>supra</u>, the committee declined to "enhance" the sanction against the respondent on the basis that the respondent's withheld discovery also violated rule 3.4 (d), which in part requires a lawyer to "make [a] reasonably diligent effort to comply" with opposing counsel's discovery requests. The committee observed that, in the circumstances of this case, the respondent's "technical violation" of rule 3.4 (d) constituted a lesser included offense of his violation of rule 3.4 (a), which prohibits the "<u>unlawful</u>[]" obstruction of "another party's access to evidence" (emphasis added).  The board elected not to disturb that conclusion, and the court agrees with the board in the circumstances here.  Cf., e.g., <u>In re Robert K. Rainer</u>, 35 Mass. Att'y Discipline Rep. 494 (2019) (respondent's repeated failure to produce documents as part of alimony modification proceedings initiated by former wife violated rule 3.4 [d]; no charge under rule 3.4 [a]).

iv. <u>Contempt orders</u>. Rule 3.4 (c) provides that a lawyer shall not "knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists." The respondent does not challenge that he failed to pay alimony to Lucretia pursuant to probate court orders, nor could he; the respondent was found in contempt on several occasions and jailed for noncompliance. See HCR ¶¶53-72, 96. The respondent's only argument on appeal to the board was that he lacked the ability to pay.

The record supports the committee's conclusion that the respondent did have the ability to pay; that his failure to pay was knowing; and, consequently, that his decision not to pay court-ordered alimony violated rule 3.4 (c).[19] In concluding that the respondent had means to satisfy the judgements, the committee relied properly on dozens of exhibits produced over six days of testimony. This record, in turn, produced several examples of income earned and assets held by the respondent, three of which warrant mention here: (i) his fifty percent share in the proceeds from a revenue-generating property "flipping" business with Kane starting in 2010, involving approximately ten

---

[19] While the respondent confirmed before this court that he is not challenging the hearing committee's factual findings at this point, he did raise this issue on appeal to the board, and the court addresses the relevant facts found by the committee for completeness's sake.

real estate projects;[20] (ii) his undisputed sole ownership of

109R Woodlawn Avenue, a property that he failed to disclose on

his financial statement, see HCR ¶¶84-85; and (iii) his

ownership interest in 130 Weymouth Road, his primary residence,

a property worth approximately $700,000, which was the unsold

last project he and Kane had collaborated on, and in which the

respondent had resided for years as of 2022, paying the real

estate taxes and no rent.[21]  See Cooper v. Cooper, 43 Mass. App.

---

[20] The respondent testified that most of the approximately
ten real estate projects in which he engaged were not
profitable.  He did not support this testimony with record
documentation, and his testimony was contradicted by Kane's
testimony that there were indeed profits, split equally between
the two men except for one project in which the respondent
received all of the proceeds, and that they made a profit "most
of the time."  Kane's testimony found at least qualified support
in HUD statements showing that the gross profits on several of
the properties were significant, albeit not accounting for
renovation costs.  See HCR ¶21, citing to Ex. 7 at *377-379,
*382-384 (for the following Holbrook properties showing gross
profits of approximately $354,000 for 6 Oak Street; $191,000 for
4 Hawthorne Road; $90,000 for 34 Ernst Road; $273,000 for 22
Johns Avenue; and $224,000 for 77 Hilltop Road); HCR ¶¶107-110;
B.B.O. No. C3-19-00262446, Tr. Vol. VI at *75-77 (testimony by
Kane that respondent earned all $80,000 in profit from sale of
one investment property in which Kane did not have financial
interest).

[21] See HCR ¶¶27, 37-38, 114.  Relevant to the timeline of
the respondent's contempt judgments (2016-2019), the credited
evidence shows that the respondent moved into 130 Weymouth Road
in 2017; he put more money into the property than Kane, who
contributed $135,000 and performed the renovations, which were
completed in approximately 2018; the house belongs to respondent
and not to Kane; and Kane had encouraged the respondent to sell
the property to satisfy his alimony arrears and Lucretia's
attorney's fees.  See id. at ¶114; Ex. 30 (RBK 0845); Ex. 73 at
*600; Tr. Vol. 6 at 48:11-22.

Ct. 51, 53 (1997), citing <u>Krokyn</u> v. <u>Krokyn</u>, 378 Mass. 206, 210 (1979) ("ability to pay alimony" includes "all forms of income and capital assets a spouse possesses").

In sum, the record supports the committee's conclusion that the respondent violated rule 3.4 (c). The committee was not required to credit the respondent's financial statements showing lack of income and assets. Indeed, the committee "is not obligated to credit the respondent's [evidence] as true even if it is uncontradicted," let alone when it goes against the weight of evidence that he was concealing assets. <u>Matter of Barrett</u>, 447 Mass. 453, 460 (2006). See <u>Matter of Saab</u>, 406 Mass. at 328.

v. <u>Rule 8.4 (h)</u>. Under rule 8.4 (h), it is also professional misconduct for a lawyer to "engage in any other conduct that adversely reflects on his or her fitness to practice law."

As discussed above, the committee found that bar counsel did not prove a violation of rule 8.4 (h) based on the respondent's false statements to the tribunal and discovery violations. The committee concluded that the reference in rule 8.4 (h) to "other misconduct" required bar counsel prove misconduct in addition to that punished under rules 3.3 (a), 3.4 (a), and 8.4 (c) and (d). See HCR ¶¶127, 131. The board disagreed, reasoning:

"The reference in the rule to 'any other conduct' does not mean that there must be separate or additional behavior. The key differentiator is the qualification that the misconduct reflect 'adversely' on the lawyer's fitness to practice law, a separate conclusion that must find support in the record even if the evidence is identical to the facts relating to other violations."

Memorandum of Board Decision at *17.  The board's interpretation is squarely on all fours with our precedent.  See In re Lupo, 447 Mass. at 356 (attorney's filing of retributive lawsuit against daughter of former client who filed grievance against him violated rules 8.4 [d] and [h]); Matter of Zankowski, 487 Mass. at 141 (attorney's intentional billing for services not rendered violated rule 1.5 [a] as well as 8.4 [c] and [h]); Matter of Broderick, 20 Mass. Att'y Discipline Rep. 53, 54-56 (2004) (two-year suspension for refusal to return unearned portion of advance fee and generating false billing records to justify fee, in violation of rules 1.5 [a], and 8.4 [c], [d], and [h]).

To be sure, rule 8.4 (h) can, and does, function as a residual catch-all for conduct that does not fall neatly under the other paragraphs of rule 8.4.[22]  However, in deciding whether a violation of rule 8.4 (h) has occurred, the operative question

---

[22] See Mass. R. Prof. C. 8.4, comment 7 ("Paragraph [h] prohibits conduct that adversely reflects on a lawyer's fitness to practice law, even if the conduct does not constitute a criminal, dishonest, fraudulent, or other act specifically described in the other paragraphs of this [r]ule").

is whether the challenged conduct "adversely reflects on [the attorney's] fitness to practice law."  If answered in the affirmative, that attorney has violated rule 8.4 (h), along with any other rules implicated by the conduct.  See In re Lupo, 447 Mass. at 356; Matter of Zankowski, 487 Mass. at 141; Matter of Broderick, 20 Mass. Att'y Discipline Rep. at 54-56.

The record plainly supports the board's conclusion that the respondent's conduct adversely reflects on his fitness to practice law and thus violated rule 8.4 (h).  While the board did not spell out the precise basis for its conclusion in this regard, this court finds the conclusion manifestly well supported in the record of the respondent's intransigent failure to comply with reasonable discovery requests; multifaceted concealment of assets; and repeated failure to provide factual or other support for arguments and assertions he made throughout the proceedings before the Probate and Family Court.  As the board elsewhere concluded, the respondent's conduct in defending against his former wife's complaint for modification seeking alimony "form[ed] a web of misconduct" that "displayed contempt for the probate court" as well as for "the administration of justice."  The record thus supports the board's conclusion that the respondent's conduct "adversely reflects on [his] fitness to

practice law" in violation of rule 8.4 (h).[23]

     c. <u>Aggravating factors</u>. The committee concluded, and the
board agreed, that the respondent's case included several
factors weighing in aggravation, including his lack of candor;
his lack of insight about, or appreciation of, our rules of
professional conduct; his multiple violations; his greed and
self-interest; and the harm he caused to his former wife and the
administration of justice. See <u>Matter of Eisenhauer</u>, 426 Mass.
at 455 (board "must consider a respondent's lack of candor . . .
in formulating a recommendation for discipline"); <u>Matter of
Clooney</u>, 403 Mass. 654, 657-658 (1998) (attorney's "persistent
assertions that he did nothing wrong . . . demonstrated that he
continues to be unmindful of certain basic ethical precepts of
the legal profession" [internal quotation omitted]); <u>Matter of
Saab</u>, 406 Mass. at 326-327 (consideration of cumulative effect
of several violations is proper when fixing sanction); <u>Matter of
Pike</u>, 408 Mass. 740, 745 (1990) (centering financial interest

---

[23] The court notes that the respondent did not argue to this
court that the board's finding of a rule 8.4 (h) violation
amounts to unfair "double-counting" of a lesser included offense
in the sense that caused the board and committee not to consider
his rule 3.4 (d) violation as enhancing the penalty warranted
for the rule 3.4 (a) violation based on the same conduct. In
any case, for avoidance of doubt, and particularly because the
board did not spell out which particular conduct the board found
to violate rule 8.4 (h), this court notes that the court would
find an eighteen-month suspension appropriate here even without
considering the rule 8.4 (h) violation.

above ethical responsibilities calls for "discipline in excess
of a token suspension"); Matter of Crossen, 450 Mass. 533, 576
(2008) (causing distress to third-parties "unarguably
damage[es]" administration of justice).  Additionally, the board
agreed with the committee that the respondent's failure to
comply with probate court orders should not factor in
aggravation, as the conduct rests on the same foundation as the
violation of rule 3.4 (c).  I concur with the board in full.

    d.  Mitigating factors.  The committee did not find any
mitigating factors, having rejected the respondent's arguments
based on, among other purported factors, the fact that the
misconduct took place in a divorce proceeding, his pro se
status, and his health problems.  See note 9, supra.  On appeal
to the board, the respondent did not claim error in the
committee's finding of no mitigating factors, and the board
adopted the committee's conclusion.  Counsel for the respondent
noted at the hearing before this court that the respondent's
misconduct occurred at a time of personal anguish for
respondent, as he mourned the death of one of his sons.  While
the record does reflect the fact of his son's accidental death
in 2012 at the age of 20 at a time when the son had been
residing with the respondent, the respondent has not at any
point, including before this court, argued that this tragedy
caused his professional misconduct; nor is such a causal

relationship evident from the record.  See Matter of Johnson,
444 Mass. 1002, 1003 (2005) (no mitigation where court could not
conclude that personal problems at time of misconduct, including
family member's death, "caused his misconduct, or warrant a
lesser sanction than what is usual and presumptive"); id. (while
"the respondent's professional difficulties and financial
reversals . . . undoubtedly were stressful, [they] cannot excuse
or explain abdication of professional responsibilities").
Accordingly, the court agrees with the board's determination on
mitigation.

        e.  Appropriate sanction.  The "primary concern in bar
discipline cases is 'the effect upon, and perception of, the
public and the bar.'"  Matter of Crossen, 450 Mass. at 573,
quoting Matter of Finnerty, 418 Mass. 821, 829 (1994).  See,
e.g., Matter of Alter, 389 Mass. 153, 156 (1983).  "The purpose
of the disciplinary rules and accompanying proceedings is to
protect the public and maintain its confidence in the integrity
of the bar and the fairness and impartiality of our legal
system."  Matter of Curry, 450 Mass. 503, 520-521 (2008).  "The
appropriate level of discipline is that which is necessary to
deter other attorneys and to protect the public."  Id. at 530,
citing Matter of Concemi, 422 Mass. 326, 329 (1996).  The
sanction imposed should not be "markedly disparate" from
sanctions imposed on other attorneys for similar misconduct,

each case should be decided on its own merits, and the attorney
should receive "the disposition most appropriate in the
circumstances."  See Matter of Pudlo, 460 Mass. 400, 404 (2011),
quoting Matter of the Discipline of an Att'y, 392 Mass. 827, 837
(1984).  See also Matter of Grayer, 483 Mass. 1013, 1018 (2019);
Matter of Goldberg, 434 Mass. 1022, 1023 (2001), and cases
cited.  "In considering the appropriate sanction, 'the board's
recommendation is entitled to substantial deference.'"  Matter
of Zankowski, 487 Mass. at 153, quoting Matter of Tobin, 417
Mass. 81, 88 (1994).

In recommending a sanction, the board agreed with the
committee that the facts of Matter of Laroche-St. Fleur are
sufficiently analogous to warrant the same disposition.  There,
the full court affirmed the eighteen-month suspension of a self-
represented attorney who committed several egregious misconduct
violations during the course of her personal divorce
proceedings, 490 Mass. at 1020, 1025, namely, "(1) fil[ing]
multiple knowingly false financial statements under the pains
and penalties of perjury [in violation of Mass. R. Prof. C. 3.3
(a) (1) and (3), and 8.4 (c)]; (2) disobey[ing] various orders
of the probate court resulting in multiple contempt judgments
[in violation of rules 3.4 (c) and 8.4 (d)][;] . . . and (3)
pursu[ing] a frivolous" claim in bad faith, in violation of
rules 3.1 and 8.4 generally.  Id. at 1020.  The court agreed

that the respondent proved no factors in mitigation and possessed many factors in aggravation and concluded that an eighteen-month suspension was "not markedly disparate from sanctions imposed in similar cases." Id. at 1024-2025.[24]

This court agrees the facts and misconduct in Matter of Laroche-St. Fleur are highly similar to those in the present case in a number of respects. Both respondents, facing the prospect of financial obligations to former spouses, wrongfully engaged in prolonged efforts to obfuscate their assets including by repeatedly filing sworn financial statements that contained multiple falsehoods and failing to cooperate in discovery at the

---

[24] The court observed that "while a two year-suspension is considered a 'usual and presumptive' sanction for making false statements under oath," similar forms of misconduct committed during the course of an attorney's own divorce typically have garnered suspensions ranging from several months to one year" (citations omitted). Matter of Laroche-St. Fleur, 490 Mass. at 1024, quoting Matter of Diviacchi, 475 Mass. 1013, 1020 (2022). The court noted that "[t]his disparity may reflect a confluence of mitigating circumstances in such cases, or a commonsense understanding that infractions motivated by 'deep disagreements' with an estranged spouse can be 'a poor predictor of future professional misconduct, especially as regards client matters.'" Matter of Laroche-St. Fleur, supra, quoting Matter of Leahy, 28 Mass. Att'y Discipline Rep. 529, 535 (2012). "Nonetheless," the court concluded, "it is well established that an attorney is not 'entitled to a free pass simply because the matter about which [he or] she testified falsely was a private one that arose in the context of a purely personal relationship'" (quotation omitted). Matter of Laroche-St. Fleur, supra, quoting Matter of Leahy, supra. This court follows the full court's instruction that "we must ultimately decide every case on its own merits" (quotation omitted), including by comparing the respondent's conduct with those in other cases that garnered lesser sanctions. Matter of Laroche-St. Fleur, supra.

cost of delaying the proceedings and burdening the court and the former spouse, and repeatedly delayed satisfaction of adverse judgments, resulting in repeated contempt judgments.  In so doing, the respondents violated substantially the same rules of professional conduct; moreover, they demonstrated clear contempt for the Probate and Family Court and the administration of justice.

At the hearing before this court, counsel for the respondent argued that Laroche-St. Fleur is distinguishable because the attorney in that matter was "willfully noncompliant" with court orders, leading to six contempt judgments for failing to take court-ordered actions such as selling the marital home and paying her former husband's attorney's fees.  See id. at 1022-1023.  This court finds the purported distinction unpersuasive.  The court has affirmed the committee's conclusion that the respondent had the ability to comply with his court-ordered obligation to pay alimony and attorney's fees and similarly repeatedly failed to pay them, resulting in five contempt judgments.  And, to the extent that counsel references the Laroche-St. Fleur attorney's noncompliance with the order of term suspension during the pendency of the appeal to the full bench, the full court expressly stated in Laroche-St. Fleur that its affirmance of the board's eighteen-month suspension "d[id] not rely in any way on [her] . . . recent contempt order."  Id.

at 1021 n.6.  In sum, these two similar matters are not distinguishable on the bases offered by the respondent.

As the board found, the other cases cited by respondent's counsel in support of a lesser sanction do not involve the "constellation of misconduct" here.  For example, while the circumstances in Matter of Ring, 427 Mass. 186, 188-189, 193 (1998) (three-month suspension), bear similarities to those here, they are also distinguishable in important respects.  In Ring, the respondent entered into a stipulation with bar counsel that he had "repeatedly disobey[ed] court orders entered in his divorce action," resulting in seven separate adjudications of contempt, the issuance of three separate arrest warrants, and "two brief incarcerations."  Id. at 188.  However, while the full court noted the respondent's violations of court orders were "knowing" and "contemptuous," there was no suggestion that the respondent had, at any point during his course of self-destructive behavior, resorted to making intentional misrepresentations to the tribunal.  Id. at 192.  Moreover, the court considered in mitigation the testimony of the respondent's psychiatrist that the attorney's judgment at the time was clinically impaired due to depression he experienced from the breakup of his marriage.  Id. at 191-192.  Finally, the court noted that it was constrained by the board "not press[ing] for more than a three-month suspension" and stated that it would

"have proposed a longer suspension" but for the unusual procedural circumstances of the case.[25]  Id. at 193.

Nor is this a case, like some others, where the attorney's misconduct during the attorney's own divorce consisted solely of misrepresentations in the attorney's financial statements.  See, e.g., Matter of Finnerty, 418 Mass. at 829-830 (six-month suspension for deliberate misrepresentation of total assets during contested divorce proceeding with no aggravating factors and several in mitigation); Matter of Kilkenny, 26 Mass. Att'y Discipline Rep. 288, 290 (2010) (three-month suspension for omitting key income year from financial statement during divorce proceedings where omission was done at respondent's attorney's direction).  Such cases are plainly distinguishable from the circumstances here, where, as the committee found, the respondent engaged in a "web" of misconduct, including deliberate misstatements of fact to the tribunal beyond those in his financial statements as well as misconduct during discovery, aggravated by a lack of candor before the committee itself in addition to other factors.

---

[25] The board in Ring had initially recommended a one-year suspension.  Id. at 190.  Following an unsuccessful procedural motion by the attorney, a smaller quorum of the board revisited the issue, "[w]ith four members voting for and five against . . . (1) a one-year suspension, (2) a nine-month suspension, and (3) a six-month suspension."  Id.  Ultimately, a vote passed to recommend a three-month suspension.  See id.

And yet other cases, while also involving extensive misconduct, involved findings of factors in mitigation that are not present here.  In Matter of Leahy, 28 Mass. Att'y Discipline Rep. 529, 538 (2012), for example, an attorney was given a two-month suspension for knowing violation of court orders regarding custody and a misrepresentation to the tribunal.  However, the committee had found this misconduct mitigated by the fact that it was motivated in part by "misplaced[] concern for his children's wellbeing" and took place when the respondent was in a clinically "unstable psychological condition."  Id. at 538. See id. at 535 ("[T]he most substantial of the respondent's violations formed part of an attempt to obtain custody of his children").  Here, by contrast, the committee rejected the respondent's attempt to rely on similar factors in mitigation and instead found, with support in the record, that the respondent's conduct was aggravated by the fact that it was motivated by a pecuniary interest in hiding assets from his former spouse.  See, e.g., Ring, 427 Mass. at 192 ("The attorney's recalcitrance concerned money; it was not, for example, an emotional reaction to an order concerning custody of a child").

Based on the foregoing, Laroche-St. Fleur remains the closest analogue to the facts at bar, and the board's recommended sanction of an eighteen-month suspension from the

practice of law in the Commonwealth is appropriate.  An order shall enter suspending Ronald Bruce Kaplan from the practice of law in the Commonwealth for a period of eighteen (18) months.

/s/ Elizabeth N. Dewar
Elizabeth N. Dewar
Associate Justice

DATED:  May 28, 2024